**FOR PUBLICATION**

**FILED**

JAMES J. WALDRON,
CLERK

August 12, 2013

U.S. BANKRUPTCY COURT
NEWARK, N.J.

By:    /s/Margaret Cohen
    Deputy

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re | Case No.:        10-49177 (MS) |
| STEPHEN E. HILL and LAURI ROBIN HILL, | Chapter  7 |
| Debtors. | |
| CORNELIUS FLOYD, | Adv. Pro. No.:  11-1746 (MS) |
| Plaintiff, | |
| v. | |
| STEPHEN E. HILL and LAURI ROBIN HILL, | |
| Defendants. | |

# **O P I N I O N**

**APPEARANCES**

NACHAMIE SPIZZ COHEN & SERCHUK, PC
425 Park Avenue
New York, NY  10022
Barton Nachamie, Esq.
-and-
JEFFREY L. ROSENBERG & ASSOCIATES, LLC
Jeffrey L. Rosenberg, Esq.
46 Morgan Drive
Old Westbury, NY  11568
*Attorneys for Plaintiff*

STEPHEN E. HILL
LAURI ROBIN HILL
46 Hidden Glen Road
Upper Saddle River, NJ  07458
*Debtors/Defendants Pro Se*

**HONORABLE MORRIS STERN, Bankruptcy Judge**

## I.    INTRODUCTION.

Plaintiff Cornelius Floyd ("Floyd") moves for "partial summary judgment," excepting a purported $3,200,000 debt from the bankruptcy discharge of Defendant-Chapter 7 Debtor Stephen E. Hill ("Hill"), pursuant to 11 U.S.C. § 523(a)(19).[1]

At the heart of Floyd's motion is a "Summary Order," entered on November 30, 2010 by the Bureau of Securities of the State of New Jersey pursuant to N.J.S.A. § 49:3-47 *et seq.* (the New Jersey version of the Uniform Securities Law, "NJUSL" or more generally, "USL").   This comprehensive twenty-nine page *ex parte* Order made detailed findings including (but not limited to) specific acts of Hill, a licensed investment advisor, associated with the sale of securities for a real estate transaction ("Hackensack Park Plaza") and a venture known as "Snap-on-Smile" (a dental appliance invention).   Floyd (identified as "C.F." in the Order), a customer of Hill, had purchased securities in these ventures through Hill.

The Bureau's investigative findings generated conclusions of law regarding Hill's compliance with securities regulations (conclusions not *per se* actionable by individual investors).  *Inter alia*, it was determined that Hill had (i) engaged in dishonest or unethical practices in the securities business, (ii) employed a scheme to defraud a client, (iii) caused false records to be created and submitted to regulatory authorities, and (iv) made untrue statements of material fact or omitted material facts in the offer or sale of securities.  Hill's various investment advisor registrations were accordingly revoked and he was assessed a $210,000 civil penalty due

---

[1] At a pretrial conference of June 4, 2013, Floyd's counsel announced that Floyd was waiving trial (scheduled after much delay for June 27 and 28, 2013) and would be relying for relief *solely* on his summary judgment motion (which, in turn, isolated two counts of his complaint both asserting this section).  It was understood and agreed that the complaint against Lauri Hill, not a target of the motion, would be dismissed.

the regulator.  There was no challenge to or appeal from the Order.[2]

Before Hill's bankruptcy and the issuance of the Summary Order, Floyd had initiated two actions seeking damages from Hill and others.  On May 4, 2010 Floyd (and others) filed a complaint in the United States District Court for the District of New Jersey, targeting Hill and others for *federal securities law* violations as well as other claims associated with the Hackensack Park Plaza offering.  Floyd also initiated a similar case on May 26, 2010 in the United States District Court for the Southern District of New York against Hill and others, arising out of the Snap-on-Smile investment.  Both cases were stayed as to Hill on December 20, 2010 when he filed his Chapter 7 bankruptcy petition.  Thereafter, on April 29, 2011, Floyd filed the immediate adversary proceeding seeking both a determination of *liability* and *exception to discharge* per 11 U.S.C. § 523(a)(2)(A) (common law fraud), (a)(4) (fraud or defalcation while

---

[2] N.J.S.A. § 49:3-68(a)(1) authorizes the Chief of the New Jersey Bureau of Securities to conduct "such private investigations within or outside of this State as he deems necessary to determine whether any person has violated or is about to violate any provision of this act or any rule or order hereunder, or to aid in the enforcement of this act in the prescribing of rules and forms hereunder."  N.J.S.A. § 49:3-68(b) authorizes the bureau chief to compel document production, subpoena witnesses, administer oaths, take evidence.  N.J.S.A. § 49:3-68.1 allows the bureau chief to "proceed in an action in a summary manner or otherwise, by issuing a cease and desist order, by denying, revoking or suspending any registration or exemption under this act, by assessing civil monetary penalties, or by any combination of these actions he deems appropriate."  Per N.J.S.A. § 49:3-58(a)(1) the bureau chief may issue an order revoking a registration "if he finds (1) that the order is in the public interest" along with any one of twelve enumerated types of conduct under N.J.S.A. § 49:3-58(a)(2).  Hill was found to have violated § 49:3-58(a)(2)(ii) and (vii).  He was duly advised of the following rights upon receiving notice of the Summary Order:  "Pursuant to <u>N.J.S.A.</u> 49:3-58(c)(2), upon service or notice of the Summary Order issued by the Bureau Chief, the applicant shall have up to fifteen (15) days to respond to the Bureau in the form of a written answer and written request for a hearing. . . . [T]he Bureau Chief shall, within five (5) days of receiving the answer and a request for a hearing, either transmit the matter to the Office of Administrative Law for a hearing or schedule a hearing at the Bureau of Securities. At any hearing involving this matter, an individual respondent may appear on his/her own behalf or be represented by an attorney.  Pursuant to <u>N.J.S.A.</u> § 49:3-58(c)(3), if an applicant fails to respond by filing a written answer and request for a hearing with the Bureau within the fifteen (15) day prescribed period, the Summary Order shall remain in effect until modified or vacated."  Hill failed to respond to the November 30, 2010 notice.

acting in a fiduciary capacity), (a)(6) (willful and malicious injury to property), (a)(13) (payment

of an order of restitution per title 18, United States Code), and (a)(19).  Only the § 523(a)(19)

counts (for federal securities law violations pertaining to Hackensack Park Plaza and

Snap-on-Smile) remain at issue, given the plaintiff's waiver of trial and complete reliance on his

limited summary judgment motion.  The motion, in turn, depends almost exclusively on the

Summary Order and, presumably, the purported preclusive effect of its factual findings (not

conclusions of law).

   This adversary proceeding, through the immediate pending summary judgment motion of

the plaintiff, raises two basic issues:

   (i)  Does the Bankruptcy Code provision excepting from discharge a Chapter 7

     debtor's debts for securities law violations, 11 U.S.C. § 523(a)(19), deny the

     bankruptcy court authority to enter the *initial* substantive judgment for those

     violations (as distinguished from a *resulting* judgment for exception to discharge

     based upon a persisting judgment, decree, order or settlement)?

   (ii)  Assuming the bankruptcy court is authorized to enter that initial substantive

     judgment, does the New Jersey Bureau of Securities' "Summary Order" (revoking

     the debtor-investment advisor's various securities registrations and fining him), as

     augmented by summary judgment motion submissions, preclusively establish

     facts pertinent to the debtor's violation of securities law and his debt to this

     proceeding's investor-plaintiff, as well as that debt's § 523(a)(19) exception to

     discharge?

   The court finds that (i) it has authority to enter the initial substantive judgment, (ii) the

findings of fact of the Summary Order are not preclusive in this proceeding, and (iii) plaintiff's

summary judgment motion is denied, i.e., no substantive judgment nor judgment for exception to

discharge is to be entered against the debtor.  Accordingly, since the plaintiff has waived his

right to go forward with trial, the plaintiff's complaint shall be dismissed.

## II.    BANKRUPTCY COURT'S GENERAL JURISDICTION OVER ADVERSARY PROCEEDING AND STANDARD TO ADJUDGE MOTION.

### A.  Jurisdiction.

Bankruptcy court jurisdiction in this proceeding is granted pursuant to 28 U.S.C.

§ 1334(b) and this District's Standing Orders of Reference of July 23, 1984 and September 18,

2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (O).  This court is thus

authorized to hear and determine the plaintiff's summary judgment motion.

### B.  Summary Judgment Standard.

Summary judgment is appropriate when the court, viewing the facts in the light most

favorable to the nonmoving party, finds that there is no genuine issue of material fact, and the

moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986); Fed. R. Bankr. P. 7056, Fed. R. Civ. P. 56(a).  At summary judgment "the judge's

function is not to weigh the evidence and determine the truth of the matter, but to determine

whether there is a genuine issue for trial."  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632,

637 (3d Cir. 1993).  Use of summary judgment in bankruptcy adversary proceedings is an

efficient means to preserve limited estate assets.  It "is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are

designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*

*Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.   THIS COURT'S AUTHORITY TO ADJUDICATE LIABILITY AND DAMAGES FOR SECURITIES LAW VIOLATIONS WITHIN A § 523(a)(19)-BASED ADVERSARY PROCEEDING.

#### A.  Text of § 523(a)(19).

Section 523(a)(19) in its original form was added to the Bankruptcy Code as part of the Sarbanes-Oxley Act of 2002.  Sarbanes-Oxley was a swift reaction to what congressional reports refer to as the "Enron collapse."   As modified in 2005 (see emphasis), the section is as follows:

> (a)  A discharge under section 727 . . .  of this title [11 U.S.C.] does not discharge an individual debtor from any debt–
> (19) that—
>     (A) is for—
>         (i)   the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or
>         (ii)  common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and
>     (B)   results, *before, on, or after the date on which the petition was filed*, from—
>         (i)  any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
>         (ii)  any settlement agreement entered into by the debtor; or
>         (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

The section contains no language limiting the purview of the bankruptcy court.  However, before the 2005 amendment the exception to discharge "may have" applied *solely* to a securities law-based debt memorialized in a *prepetition* judgment, order, decree or settlement.  4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* § 523.29[1] (16th ed. 2013) (hereinafter "*Collier*").

### B.  Legislative History.

The 2002 legislative history of § 523(a)(19) includes the following statements:

> By Mr. LEAHY (for himself, Mr. DASCHLE, Mr. DURBIN, and Mr. HARKIN):
>
> S. 2010. a bill . . . *to disallow debts incurred in violation of securities fraud laws from being discharged in bankruptcy.* . . . [Emphasis added.]

148 Cong. Rec. S1783-01, *S1785 (daily ed. March 12, 2002) (statement of Sen. Leahy), 2002

WL 384616, *6.

> Section 4 of this bill would amend the Bankruptcy Code to make judgments and settlements based upon securities law violations non-dischargeable, protecting victims' ability to recover their losses. Current bankruptcy law may permit such wrongdoers to discharge their obligations under court judgments or settlements based on securities fraud and other securities violations. *This loophole in the law should be closed to help defrauded investors recoup their losses and to hold accountable those who perpetrate securities fraud after a government unit or private suit results in a judgment or settlement against the wrongdoer.*
>
> . . . *Under current laws, State regulators are often forced to "reprove" their fraud cases in bankruptcy court to prevent discharge because remedial statutes often have different technical elements than the analogous common law causes of action.* Moreover, settlements may not have the same collateral estoppel effect as judgments obtained through fully litigated legal proceedings. In short, with their resources already stretched to the breaking point, these State regulators have to plow the same ground twice in securities fraud cases. *By ensuring securities fraud judgments and settlements in State cases are non-dischargeable, precious state enforcement resources will be preserved and directed at preventing fraud in the first place.*  [Emphasis added.]

148 Cong. Rec. S1783-01, *S1787 (daily ed. March 12, 2002) (statement of Sen. Leahy), 2002

WL 384616, *8.

> *This provision would amend the Federal bankruptcy code to make judgments and settlements arising from state*

and federal securities law violations brought by state or federal regulators *and private individuals non-dischargeable*. Current bankruptcy law may permit wrongdoers to discharge their obligations under court judgments or settlements based on securities fraud and securities law violations. This loophole in the law should be closed to help defrauded investors recoup their losses and to hold accountable those who perpetrate securities fraud. [Emphasis added.]

148 Cong. Rec. S1783-01, *S1790 (daily ed. March 12, 2002) (Sectional Analysis: Corporate

and Criminal Fraud Accountability Act of 2002), 2002 WL 384616, *16.

Section 803.-Debts nondischargeable if incurred in violation of securities fraud laws

. . . *The section, by its terms, applies to both regulatory and more traditional fraud matters, so long as they arise under the securities laws, whether federal, state, or local.*

This provision is meant to prevent wrongdoers from using the bankruptcy laws as a shield and to allow defrauded investors to recover as much as possible. *To the maximum extent possible, this provision should be applied to existing bankruptcies. The provision applies to all judgments and settlements arising from state and federal securities laws violations entered in the future regardless of when the case was filed.* [Emphasis added.]

148 Cong. Rec. S7418-01, *S7418 (daily ed. July 26, 2002) (Legislative History of Title VIII of

HR 2673: The Sarbanes-Oxley Act of 2002; Section-by-Section Analysis and Discussion of the

Corporate and Criminal Fraud Accountability Act (Title VIII of H.R. 2673), 2002 WL 1731002,

*2.

As part of the broad sweep of Bankruptcy Code amendments included in the Bankruptcy

Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), the preamble language

("before, on, or after the date on which the petition was filed") was added to § 523(a)(19)(B).

The limited legislative history of the amendment is as follows:

Sec. 1404. Debts Nondischargeable If Incurred in Violation of Securities Fraud Laws. Bankruptcy Code

section 523(a)(19) makes certain debts nondischargeable that result from the violation of Federal securities law, state securities law, or any regulation or order issued under such Federal or state securities law nondischargeable. Section 1404 amends Bankruptcy Code section 523(a)(19)(B) to provide that it applies to such debts that result before, on, or after the date on which the petition was filed from any judgment, order, consent order, decree, settlement agreement, or from any court or administrative order for damages or for other specified payments owed by the debtor. *Section 1404 is effective as of July 30, 2002.* [Emphasis added.]

H.R. Rep. 109-31(I) (2005) *reprinted in* 2005 U.S.C.C.A.N. 88, 2005 WL 832198, *212. As to

retroactive application of the 2005 amendment to the original adoption date of § 523(a)(19) (i.e.,

July 30, 2002), *see In re Weilein*, 328 B.R. 553, 555 (Bankr. N.D. Iowa 2005).

### C. Case Law.

There is now substantial disagreement among courts regarding the substantive area in

which the bankruptcy court can adjudicate § 523(a)(19) claims. Some courts deny bankruptcy

court jurisdiction to adjudicate liability and damages for violation of securities law. That denial

persists, notwithstanding the 2005 amendment and the absence of any statutory language limiting

bankruptcy court authority to enter a substantive judgment. Under this narrow view of

jurisdiction the bankruptcy court would be relegated to applying issue preclusion in those (a)(19)

claims brought before it.[3] *See generally* Jordan Factor, *Making Crooks Pay: The Path to*

---

[3] *In re Bundy*, 468 B.R. 916, 921 (Bankr. E.D. Wash. 2012) ("The existence of subsection (B) to § 523(a)(19) leads to the conclusion that the bankruptcy court, once some regulatory or other judicial tribunal has determine[d] a violation of securities laws exists, may determine whether the debt at issue resulted from the violation and is thus not subject to discharge"); *In re Anderson*, 2012 WL 3133827, at *4 (Bankr. D. Idaho Aug. 1, 2012) (denying motion for summary judgment for damages from securities violation as "[o]ne of the required elements of § 523(a)(19) is that a liability determination be made in a non-bankruptcy forum 'before, on or after' the date of the filing of a debtor's petition"); *In re Pudjak*, 462 B.R. 560, 574 (Bankr. D.S.C. 2011) ("The inclusion of § 523(a)(19)(B) strips the bankruptcy court of its ability to determine whether the debtor did in fact violate the securities law"); *In re Jafari*, 401 B.R. 494, 499-00 (Bankr. D. Colo. 2009) ("[A]bsent a settlement agreement or other consensual determination of liability, Subsection B evidences a conscious choice to have *the liability determinations* occur outside of the bankruptcy forum, whether it occurs pre- or post-bankruptcy") (emphasis in original); *In re Zimmerman*, 341 B.R. 77, 80-1 (Bankr. N.D. Ga. 2006) (allowing plaintiffs to present liability claims in arbitration proceeding prior to dischargeability determination, stating "Section 523(a)(19)

9

*Nondischargeable Securities Judgments*, 41 Colo. Law. Mar. 2012, at 47.  Other courts have held

that the bankruptcy court can fully adjudicate liability, damages and exception to discharge in a

§ 523(a)(19)-based adversary proceeding.[4]  Under either view of jurisdiction, these causes may

be determined in the bankruptcy court or in another court of competent jurisdiction.[5]

---

contemplates a postpetition determination of liability by a nonbankruptcy forum for debts resulting from
securities law violations . . . . § 523(a)(19) and § 362(c)(1) express a Congressional determination that
creditors asserting a debt of this nature have the right to pursue their claims under nonbankruptcy law in
other courts, notwithstanding the bankruptcy filing").

[4] *In re Chan*, 355 B.R. 494, 504-05 (Bankr. E.D. Pa. 2006) ("[S]ection 523(a)(19) is indistinguishable
from the other discharge exceptions determinations which are not committed to the exclusive jurisdiction
of the bankruptcy court by 11 U.S.C. § 523(c)(1)."  The court denied the creditor's motion for stay relief
to litigate the alleged securities violation in a nonbankruptcy forum as "[t]he phrase 'before, on, or after
the date on which the petition was filed' was not added to § 523(a)(19) to provide creditors with an
unfettered right to proceed in a nonbankruptcy forum . . . .  [T]he phrase was intended to make it clear
that a debt arising under the federal securities laws or as a result of fraud in connection with the sale of a
security  may be determined nondischargeable under § 523(a)(19) even if the liability was not fixed prior
to the commencement of the bankruptcy case . . . .   [T]he phrase was added to the statute to remove a
temporal limitation from the elements of the § 523(a)(19) discharge exception"); *cf. In re Bricker*, 348
B.R. 28, 35 (Bankr. W.D. Pa. 2006) (the bankruptcy court held that it "could have ruled on the sale of
unregistered securities claims" but permissively abstained under 28 U.S.C. § 1334(c)(1)), *aff'd Bricker v.
Martin*, 265 Fed. Appx. 141 (3d Cir. 2008); *see also In re Jensen-Ames*, 2011 WL 1238929, at *6 and
*8-9 (Bankr. W.D. Wash. Mar. 30, 2011) (finding "the clear language of § 523(a)(19)(B) permits the
bankruptcy court to establish a debtor's liability for securities violations" when a proffered Consent Order
was insufficient to establish liability); *In re Jansma*, 2010 WL 282511, *5 (Bankr. N.D. Ill. Jan. 21, 2010)
(in denying the debtor's motion to dismiss the complaint, the bankruptcy court found that, even though
the proffered state court judgment and state-issued Order of Prohibition were insufficient to  prove a
violation under § 523(a)(19)(A), "the bankruptcy court can satisfy the requirements of either §
523(a)(19)(B)(i) or (B)(iii) by conducting a federal judicial proceeding and issuing" the required
judgment, order, decree); *but see In re Harrsch*, 432 B.R. 169, 175 n.10 (Bankr. E.D. Pa. 2010) (not a
securities case) (where the author of the opinion in *Chan* acknowledged the critique of *Jafari* and
indicated a willingness to revisit the decision).  *See also In re Reuter*, 686 F.3d 511, 520 (8th Cir. 2012)
(affirming the bankruptcy court's finding of liability under § 523(a)(19) in the course of finding exception
to discharge under § 523(a)(19)); *In re Hogle*, 2013 WL 1001652, at *1 (Bankr. D. Ariz. Mar. 13, 2013)
(where the court raised the decisional split over bankruptcy court authority to decide liability for violation
of securities law in a § 523(a)(19) claim, but the parties agreed to the court's authority to decide that
liability).

[5] Section 523(a) causes may, with three exceptions, be determined in either the bankruptcy court or other
courts of competent jurisdiction.  "Section 523(c)(1) gives the bankruptcy court exclusive jurisdiction to
determine the dischargeability of debts excepted from discharge under paragraph (2), (4) or (6) of section
523(a) [footnote omitted] and requires a creditor who is owed a debt that may be excepted from discharge
under paragraph (a)(2) [false statements/fraud], (4) [fiduciary fraud, embezzlement or larceny], or (6)
[willful and malicious injury] to initiate proceedings in the bankruptcy court for an exception to
discharge.  If the creditor does not act, the debt is discharged."  *Collier* § 523.29[1].   *See also Judd v.
Wolfe,* 78 F. 3d 110, 114 (3d Cir. 1996).

**D.  Analysis.**

As indicated earlier, nothing in the current text of the (a)(19) exception to discharge ousts

the bankruptcy court of jurisdiction or adjudicatory authority to reach the substance of securities

law violations.  Nevertheless, the 2002 legislative history principally rails against existing

judgments or settlements being avoided in later-filed bankruptcy cases.[6]   Acceding to the

purported import and effect of this emphasis for present purposes *only*, the substance of the

exception to discharge in 2002 may have been a securities law violation evidenced by a

judgment, order or decree as of the petition date.[7]  The "debt" at issue under this view would

have been for violation of securities law which "results from" such a prepetition judgment, order,

consent order or decree.

Whether Sarbanes-Oxley was truly intended to be so temporally limited remains an

imponderable.  Imposing such a limitation surely opened or left open obvious "loopholes" for

securities law violators to slip through in bankruptcy.  By way of illustration (here and

recurrently), the following is a factual setting which reflects a common securities law violation

scenario and has characteristics of the immediate proceeding.  Frequently, s*tate securities law*

(USL) judgments, orders and decrees are but a first step (traditionally prompted by a *state*

*securities regulator* in an administrative proceeding) in a two-step process toward securing

restitution and other damages for *individual investors*.  The administrative proceeding is often

based upon USL violations for the sale of unregistered securities and/or sale of securities by an

unregistered investment advisor.  These violations are susceptible to objective proofs and are

---

[6] However, the 2002 legislative history makes no reference to restricting bankruptcy court jurisdiction to
enforce the bankruptcy aspects of Sarbanes-Oxley.

[7]  For immediate purposes, § 523(a)(19)(B)(ii) settlement agreements are deemed not directly relevant,
though their specified preclusive effect per § 523(a)(19) evidences Congress's intent to expand preclusion
concepts beyond those of certain otherwise applicable law.

readily established within the expertise and records of the securities regulators.  USL provisions

then accommodate the second step, a civil action by individual investors emphasizing damages;

the violations found in the administrative proceeding are often deemed to be preclusive in the

civil action.[8]  Not uncommon or unanticipated in this scenario is the filing of a bankruptcy

petition by a securities law violator upon receiving notice of the state securities regulator's

determination (often embodied in a cease and desist order or, as with Hill, an order revoking his

licensure and imposing a fine).  A debtor's race to bankruptcy ahead of a judgment, under a

reading of § 523(a)(19) *requiring* it, would thus undercut Sarbanes-Oxley.  BAPCPA made it

clear that such a race to the bankruptcy court would not disable this exception to discharge.

BAPCPA also clarified that once the purported petition date dividing line was removed from

§ 523(a)(19), there is no contextual, textual or functional justification to bar the bankruptcy court

from entering, where appropriate, the judgment in favor of investors coming forward with

preclusive regulatory orders.[9]

    BAPCPA's 2005 change to § 523(a)(19)(B)[10] has apparently been considered by the

jurisdiction-ousting courts as reflecting but a narrow purpose (i.e., solely to change the time line

for the issuance by nonbankruptcy tribunals of the necessary judgment, order or decree).  *See,

e.g., In re Bundy,* 468 B.R. at 921.   Little credence has been given to the possibility that

---

[8] *See, e.g.,* N.J.S.A. § 49:3-71(a)(1)-(5) for individual investor causes of action approximating those of the
federal securities law; investors' actions for NJUSL violations are essentially limited to these causes.
N.J.S.A. § 49:3-71(j).  With emphasis on § 49:3-71(a)(1) registration violations, *compare and contrast*
§ 49:3-71(b) with (c), reflecting lesser burden in proving liability where registration violations are found
than where more subjective and complex misrepresentation and omission violations are alleged.  *See* n.15,
*infra.*

[9] For a post-BAPCPA rendition of this factual scenario of the interaction of the USL and § 523(a)(19), *see
In re Civiello,* 348 B.R. 459 (Bankr. N.D. Ohio 2006), described more fully *infra.*  Similarly, though with
significant differences, the proceeding *sub judice* is grounded in a prepetition regulatory order revoking
Hill's investment advisor licensure and fining him for USL violations.

[10] BAPCPA's amendment of § 529(a)(19) in 2005 was "effective as of July 30, 2002"; Congress's
rationale in providing for such retroactive change has not been weighted in the debate over bankruptcy
court jurisdiction.

Congress intended a textual clarification, or a correction for an earlier oversight or unintended consequence, or otherwise to change the law, for dual purposes. Those purposes would be to maximize the range of tribunals available to determine securities law violations as well as to extend the time line for issuance of such determinations.[11]  Two arguments are advanced for reading the section's amended text other than as written.

First, a certain amount of the influence for this continuing restriction of the bankruptcy court jurisdiction/authority comes from an inclination to read the (a)(19) exception to discharge "consistently" with other such exceptions, i.e., mainly (a)(11), but also (a)(7), (a)(13) and (a)(17). These sections have predicates in prepetition judgments or orders.   However, they are plainly narrow-gauge exceptions to discharge for fines, penalties, or restitution payments under relatively circumscribed circumstances.

Section 523(a)(11), adopted in 1990, excepts debts "provided in any final judgment, unreviewable order, or consent order or decree . . . or contained in any settlement agreement . . . arising from any act of fraud or defalcation while acting in a fiduciary capacity committed with respect to any depository institution or insured credit union."[12]  *Meyer v. Rigdon* compared this exception with the more generalized nondischargeable debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny" (§ 523(a)(4)).    36 F.3d 1375 (7th Cir. 1994). The more narrow purpose § 523(a)(11) requires prepetition "*any* final judgment," settlement agreement or administrative order establishing the debtor's liability.  Common law preclusion

---

[11] The *Jafari* court acknowledged the possibility that in 2005 Congress intended to extend the preclusive effect of pre- and post-petition mandates "without intending to prevent the bankruptcy court from reaching its own determination of liability when no prior decision existed."  The court went on to argue against this possibility.  401 B.R. at 499.

[12] Section 523(a)(7), adopted in 1978, makes nondischargeable a debt for "a fine, penalty, or forfeiture payment to and for the benefit of a governmental unit"; § 523(a)(13), adopted in 1994, renders nondischargeable a debt for the payment of "an order of restitution issued under title 18, United States Code"; and, § 523(a)(17), adopted in 1996, provides that a debt "for  a fee imposed on a prisoner by any court" for court filing is excepted from discharge.

was found to have been modified by an expanded statutory version (e.g., by including *default judgments* in "any final judgments" deemed preclusive). Preemption applied. *Id.* at 1380. Section 523(a)(4), on the other hand, permits substantive liability to be decided by the bankruptcy court and plainly *requires* that a timely adversary proceeding be initiated in the bankruptcy court for its exclusive determination of exception to discharge. *See* § 523(c)(1). The § 523(a)(11) statutory structure (as purportedly supported by § 523(a)(7)(13) and (17) which likewise exclude bankruptcy court substantive adjudications) is cited as analogous by those who see no place for full bankruptcy court adjudication of § 523(a)(19) claims. *Yet ultimately neither § 523(a)(11) nor the other cited "parallel parts" of § 523(a) are grounded in law as nuanced and broad as securities law.*[13]

Moreover, in recognition of some need to extend the "reach" of Sarbanes-Oxley, § 523(a)(19) and not the supposed like sections, was amended. Today, it cannot be argued that § 523(a)(7)(11)(13) and (17) are structurally consistent with § 523(a)(19). There is absolutely no reason to conclude that the 2005 amendment, unique to § 523(a)(19), was adopted *solely* to extend preclusion to postpetition determinations by nonbankruptcy courts. Since functionally there is no reason to exclude the bankruptcy court from the securities law adjudication process, there is no rational basis to read § 523(a)(19) other than the way its text now provides. After 2005, no concept of inconsistency or lack of parallelism with other parts of § 523(a) could support a nonliteral interpretation of § 523(a)(19).

The second argument by courts that would exclude the bankruptcy court from adjudicating securities law violations per § 523(a)(19)(B) is more sweeping in scope. It is argued that allowing the bankruptcy court to adjudicate fully securities law violations and the resulting exception to discharge "would essentially read the Subsection B requirement out of the statute." *In re Jafari,* 401 B.R. at 499. The *Jafari* court went so far as to offer the following

---

[13] *See* n.19 *infra*.

view:

> At that time [when in 2005 BAPCPA amended
> § 523(a)(19)], if Congress' only concern was to give
> preclusive effect to non-bankruptcy determinations, and it
> had not intended to prevent the bankruptcy court from
> deciding liability itself, it could have eliminated the
> Subsection B requirement, *and added to Subsection A that
> prior determinations by a court, regulatory agency, or the
> parties to a settlement agreement were to be given
> preclusive effect, without regard to traditional preclusion
> doctrines.* [Emphasis added.] [*Ibid.*]

This court respectfully differs with *Jafari's* view of the expendability and effect of Subsection B,

even where the bankruptcy court is included in the mix of tribunals rendering substantive

securities law determinations.  Moreover, as will be seen in Point VI, *infra*, the impact of this

section on "traditional preclusion doctrines" requires detailed study, not a cryptic amendatory

phrase.

*In re Civiello*, referenced earlier (348 B.R. 459), exemplifies the aforereferenced

common two-step process leading to USL civil liability; liability there was established *in

bankruptcy*.  An administrative cease and desist order was issued against Civiello, who in

violation of the USL both sold unregistered securities to Ohio residents and did so without

having been licensed as a dealer.  *Id.* at 464.  Though not a "final order," the administrative order

was deemed to have satisfied § 523(a)(19)(B)(iii) (as well as (a)(19)(A)).  However, the order

did not identify any particular individual investor or provide a *judgment* to any investor.  It was

thus mischaracterized (in the view of this court) as qualifying for any expanded preclusive effect

under § 523(a)(19)(B).[14]  (The "debt" to be discharged did not "result . . . from" that order.)

---

[14] The divergence from authority in considering the cease and desist order under § 523(a)(19)(B) was
acknowledged by the *Civiello* court ("[u]nder *Collier* [§ 523.24B, p.523-131], since the cease and desist
order does not memorialize the debt, it would not satisfy the second [§ 523(a)(19)(B)] requirement").
348 B.R. at 466.  Though this court agrees with the cited authority, the *Civiello* opinion is nonetheless
valuable as reflecting this oft-occurring fact pattern and as an example of where state preclusion law may
well apply to an order which establishes a violation of securities law (albeit without being the immediate
source of "debt").  That order would then serve as a basis for establishing via common law issue
preclusion *violation* of securities law, leading to a bankruptcy court judgment for an investor, both

Nevertheless, the structure of the "Civil Liability" section of the Ohio version of USL appears to have enabled the ready transition from the order to a remedy for the individual investor. *See* O.R.C. § 1707.43(A) providing for the voidability of every securities sale, at the election of the purchaser, where licensing and/or registration requirements have been violated. *Id*. at 466.[15]

After determining that the materiality requirement was satisfied as a matter of law and that the adversary proceeding in bankruptcy was filed within the limitations period, *the bankruptcy court in Civiello issued the judgment in favor of the plaintiffs.* This judgment plainly went to both the substance of the securities law violation and the resulting exception to bankruptcy discharge. Of course, the Civiello judgment could have been entered by a court other than the bankruptcy court (either prepetition or after stay relief, postpetition). However, the administrative efficiency of utilizing the nonfinal cease and desist order as a basis per Ohio law[16] for the ultimate bankruptcy court judgment benefiting the investors is both undeniable and thoroughly consistent with the purposes of Sarbanes-Oxley. Maintaining bankruptcy court authority to issue judgments in this kind of unexceptional factual setting in no way "reads . . . out" Subsection B from the Code.

---

creating the "debt" and excepting that debt from discharge.

[15] As indicated earlier, n.8 *supra,* NJUSL has a comparable essentially *"per se"* civil liability provision inuring to the benefit of those purchasers or sellers of securities where licensing and/or registration requirements have been violated. *See* N.J.S.A. § 49:3-71(a)(1) (incorporating the regulatory requirements to register securities, etc. of N.J.S.A. § 49:3-55, 56 and 60), and the damages provision, N.J.S.A. § 49:3-71(c). Though civil liability under NJUSL includes, at § 49:3-71(a)(2)-(5), more expansive misrepresentation/fraud causes, these causes (similar to federal causes under Rule 10b-5) are not *per se* incorporations of regulatory causes. It is emphasized that the plaintiff *sub judice* asserts State Summary Order findings of fact in the context of *federal* Rule 10b-5 claims; no such claim is in the nature of N.J.S.A. § 49:3-71(a)(1) *per se* registration/licensure violations (as in *Civiello).*

[16] The court was satisfied that due process was provided through the Ohio Department of Commerce's Division of Securities adherence to hearing requirements; thus, "the cease and desist order was a valid adjudication [of securities law violations for failure to register securities and as a broker] by the division in accordance with its powers and duties." 348 B.R. at 465. *See* references to collateral estoppel, 348 B.R. at 462. In sum, though the cease and desist order in this scenario does not garner potentially extended preclusivity per Subsection B, its preclusive effect under existing applicable law is not lessened by Sarbanes-Oxley.

16

Other anticipated common § 523(a)(19) fact patterns would call for exercise of broad

bankruptcy court jurisdiction *without any reliance on issue preclusion.* Consider the following

ordinary-course hypothetical. With no predicate judgment, order or decree prepetition (indeed,

no prepetition regulatory or civil liability action having been initiated), an individual investor

files a § 523(a)(19) exception to discharge adversary proceeding. The investor asks this court to

determine that the debtor has violated federal securities law[17] (or the roughly parallel USL), that

a civil liability judgment (including damages) should be rendered against the debtor, and that the

debt reflected in the bankruptcy court judgment should be excepted from the bankruptcy

discharge. The jurisdictional naysayers would contend that full bankruptcy court adjudication in

such a proceeding would render § 523(a)(19)(B) meaningless. How would those naysayers

satisfy the basic purposes of *Sarbanes-Oxley* if not through bankruptcy court implementation in

such an example? Their "way out," if the bankruptcy court is barred from full decision-making

duties, is to have the investor seek relief from the automatic stay to commence a civil action

elsewhere for securities law violations. Then a predicate judgment could be developed for the

bankruptcy court per § 523(a)(19), or the entire matter (exception to discharge included) could

be decided in the civil litigation. This jurisdictional-disabling result removes the traditional

flexibility which bankruptcy courts have in abstaining or not abstaining[18] in a wide range of

proceedings, after considering bankruptcy case administration needs.[19] Such an impractical

---

[17] Federal securities law claims in bankruptcy, as in the matter at bar, are under certain circumstances subject to discretionary or mandatory withdrawal of the reference per 28 U.S.C. § 157(d); no motion for such relief has been made in this proceeding. *See In re Chan*, 355 B.R. at 505-06.

[18] 28 U.S.C. § 1334(c)(1) provides: "[N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." *See* 28 U.S.C. § 1334(c)(2) as to mandatory abstention.

[19] The burden which restricted jurisdiction would put on bankruptcy case administration would manifest in countless circumstances. Potential securities law-based claims and ongoing processes which could be presented to the bankruptcy court (or other courts) under § 523(a)(19) would include: (i) those with complete dispositive prepetition predicate judgments, order decrees which would fit the 2002 prototype

17

result is not justified, *especially given that the text of § 523(a)(19) is unambiguous.*   Rather than "reading out" Subsection B of § 523(a)(19), full bankruptcy court jurisdiction maximizes achievement of the purposes of Sarbanes-Oxley, while fostering sensible bankruptcy case administration.   Subsection B continues to have meaning per the detailed provisions of (a)(19)(B)(i)(ii) and (iii).

As just described, it is made clear by BAPCPA that use of preclusion in the bankruptcy court is not always necessary for a § 523(a)(19) adjudication.   A near-opposite illustration of § 523(a)(19)'s range would involve Subsection B's potential *preemptive expansive effect* on traditional issue preclusion doctrine.   As more fully detailed in Point VI C, *infra,* consider on a hypothetical basis a claim to except from discharge the Summary Order's $210,000 fine.   Conceptually, even if the Order would not qualify for preclusivity (*as to the fine*) under traditional doctrine, Subsection B could be asserted as overriding the applicable law's limitations on issue preclusion.   In such a case, that aspect of Sarbanes-Oxley which would focus on preclusivity (included in Subsection B but not the sum total of its import) would be employed.

The immediate proceeding, as originally posited and before Floyd's waiver of

---

for issue preclusion (collateral estoppel) in exception to discharge post-petition proceedings; (ii) those with less than completely dispositive prepetition predicates (e.g., *Civiello*); and (iii) those with no prepetition predicates (though, of course, arising out of prepetition conduct of debtors) requiring full adjudication in some forum (which should include as an initial option the bankruptcy court).   Adversary proceedings or other securities law actions are likely to include: (i) multiple substantive securities law-based causes (e.g., USL claims as well as common law fraud); (ii) a number of different grounds for exception to bankruptcy discharge (e.g., § 523(a)(2)(A) common law fraud, (a)(4) embezzlement or defalcation by a fiduciary, (a)(6) willful and malicious injury to property); and (iii) multiple parties, crossclaims and third-party actions).   Predicate prepetition judgments, orders, and decrees (and settlements, a § 523(a)(19)(B)(ii) subject adding to the overall complexity of this exception to discharge) come in all descriptions; they: (i) are judicial or administrative; (ii) are *final* or *nonfinal;* and (iii) provide direct relief to particular investors, or only regulatory sanctions and directives, or perhaps some combination.   Whether as a predicate prepetition cause for violation of securities laws, or as the basis for a post-petition action (grounded in prepetition violations), the securities law at issue might be: (i) federal statutory law or rule based; or (ii) state statutory law or rule based, or have its footings in state common law.   *Inter alia,* Sarbanes-Oxley is best implemented by maximizing the tribunals available for determination of securities law violations.

non-(a)(19) claims and trial, again illustrates the benefit of the co-existence of § 523(a)(19)(B)

and full bankruptcy court jurisdiction.  This bankruptcy court was being called upon per

§ 523(a)(19) to apply the purported preclusive effect of the Summary Order issued against Hill.

If the Order were deemed to be preclusive and, with additional motion submissions, dispositive,

the bankruptcy court would have a more limited role in applying § 523(a)(19).  However, if the

Order were held to be not preclusive, placing a limitation on bankruptcy court jurisdiction would

be disruptive.  Would any resulting trial of § 523(a)(19) issues have to be shifted at a late date in

the proceeding to another forum?  How would exceptions to discharge for common law fraud

(§ 523(a)(2)), fraud or defalcation of a fiduciary ((a)(4)), and willful and malicious injury ((a)(6))

– so often coupled with those of (a)(19) but subject to exclusive bankruptcy jurisdiction – be

adjudicated?  Congress could not have intended to create the procedural mishmash which limited

bankruptcy court jurisdiction engenders.

Section 523(a)(19) speaks clearly for itself when it identifies as the object of this

exception to discharge --

> a "debt . . . for violation of . . . securities laws . . . [which]
> results, before,  on, or after the date on which the petition
> was filed, from . . . any judgment . . . entered . . . in any
> Federal . . . proceeding."

Consistent with Sarbanes-Oxley and BAPCPA, this court has the jurisdiction and authority to

enter the "resulting" judgment (§ 523(a)(19)(B)(i)) for securities law violations

(§ 523(a)(19)(A)), in a wide array of adversary proceedings to except debts from discharge.

## IV.   THE SUMMARY ORDER AND THE APPLICABLE FEDERAL SECURITIES LAW.

### A.  Civil Liability Under Federal Securities Law.

The relevant federal securities law *sub judice* is Section 10(b) of the Securities Exchange

Act of 1934.  15 U.S.C. § 78j(b).  Pursuant to this section, the well-known Rule 10b-5 provides

an individual investor with a cause of action for violative acts in connection with the purchase or

sale of any security.  Under Rule 10b-5 it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b–5.  The Supreme Court in *Dura Pharmaceuticals, Inc. v. Bruodo* identified the following elements of Rule 10b-5 actions:

> (1)    a material misrepresentation (or omission);
> (2)    scienter, i.e., a wrongful state of mind;
> (3)    a connection with the purchase or sale of a security;
> (4)    reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation';
> (5)    economic loss; and
> (6)    'loss causation,' i.e., a causal connection between the material misrepresentation and the loss.

544 U.S. 336, 341-42 (2005) (internal cites, parentheticals, and emphases omitted); *see McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).[20]

---

[20] "The first step for a Rule 10b-5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. Next, plaintiff must establish that defendant acted with scienter and that plaintiff's reliance on defendant's misstatement caused him or her injury.  Finally, since the claim being asserted is a 'fraud' claim, plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."  114 F.3d at 1417.

**B.  Pertinent Factual Findings of the Summary Order**.

The Summary Order details Hill's violation of New Jersey state regulatory requirements pertaining to his licensure as an agent and/or investment advisor representative.  He had been registered as such with the New Jersey Bureau of Securities since approximately 1993.  It is emphasized that the detailed violations go to matters beyond the Hackensack Park Plaza and SOS securities sales and to infractions which do not relate to plaintiff Floyd.  The conduct of affiliates of Hill was also targeted in the Order.  The summary process by which the Order was entered is authorized by N.J.S.A. § 49:3-58(c).  Hill was given "Notice of Right to Hearing" pursuant to N.J.S.A. § 49:3-58(c)(2) (allowing a fifteen-day response and hearing request period).  *See* processes provided for by the New Jersey Administrative Code (N.J.A.C. 13:47A-13.13).  Hill failed to request a hearing (either before his bankruptcy filing[21] or thereafter).  Therefore, by statute, he waived his rights to a hearing.  *See* N.J.S.A. § 49:3-58(c)(3) and N.J.S.A. § 52:14B-1, *et seq.*

The findings of fact embodied in the Summary Order which relate to Floyd's Rule 10b-5 action against Hill for Floyd's purchase of Hackensack Park Plaza securities (Complaint Count VI), and his purchase of SOS securities (Complaint Count XII), include:

> 23.    The Hackensack Park Plaza Private Placement Memorandum that was purportedly provided to one or more investors stated that Hill "received a Bachelor's Degree in Economics and Finance from the University of Buffalo in New York in 1987."
>
> 24.  Hill did not graduate from college.
>
> . . .
>
> 50.    On or about October 3, 2008, Hill solicited C.F. to invest $103,000 in Snap-on Smile.  Relying upon the conversation with Hill, C.F. agreed to invest $103,000 in Snap-on Smile.

---

[21] The fifteen-day request period ran shortly before Hill's December 20, 2010 petition filing date.

51.     Although C.F. had only agreed to invest $103,000, Hill caused three transfers totaling approximately $1,800,000 to be made from C.F.'s accounts to SOS OPCO's bank account.

52.     On October 3, 2008, Hill directed Ciano [a co-worker, *see Summary Order ¶ 5*] to make the transfers of C.F.'s money.  To effectuate the transfers, Ciano e-mailed C.F.'s accountant, who had authorization over C.F.'s funds, directing the accountant's office to transfer $103,000 to SOS OPCO's bank account.   Upon reliance of Ciano's e-mail, C.F.'s accountant transferred $103,000 from C.F.'s bank account to an SOS OPCO bank account.

53.     Within hours of the request to transfer $103,000.00 and without C.F.'s permission, Ciano created two additional requests for transfer of funds to be sent to Pershing LLC ("Pershing"), Royal Alliance's clearing firm.[22]

54.     The first request for transfer of funds ("First Request") Ciano created was addressed to Pershing from C.F., and directed Pershing to transfer $220,000 from C.F.'s account to SOS OPCO's bank account.  Although the First Request purported to contain C.F.'s original signature, the signature was copied and applied without C.F.'s authorization from a Kolinsky-Hill Financial file.[23]  Ciano   sent   the   First Request   to   Royal   Alliance's   operations    department which   then   forwarded   the   falsified   transfer   instruction on   to   Pershing.    Upon   reliance   of   the   falsified document, Pershing transferred $220,000 from C.F.'s Royal   Alliance   account   ending   in   6917   to   SOS OPCO's  bank account.

55.     On October 3, 2008, Ciano also created a second request for transfer of funds ("Second Request") addressed to  Pershing  from  "C.F."  for  $1,477,000  and  directed Pershing to transfer the funds from C.F.'s account ending in   3587   to   SOS  OPCO's   bank   account.    The  Second Request   was   returned   requiring   a   Medallion   Signature

---

[22] Royal Alliance is the broker-dealer which employed Hill.  *See* Summary Order ¶¶ 2, 4.

[23] Steven Kolinsky was registered with the New Jersey Bureau of Securities as an "agent and/or investment adviser representative."  Summary Order, ¶ 1.  Debtor and he had been business partners since about 1991 and were the only members of Kolinsky-Hill Financial.   Summary Order, ¶ 4.  The New Jersey Bureau of Securities revoked Kolinsky's agent and investment adviser representative registrations. Summary Order, p.27.

Guarantee.

56.    The Medallion Signature Guarantee is an industry accepted guarantee intended to convey that the customer signature is authentic.

57.    Ciano notified Hill of the Medallion Signature Guarantee requirement.    Ciano, aware that C.F. had not been in the office that day, gave the Second Request to Kolinsky's secretary for a Medallion Signature Guarantee. Kolinsky was the only person in the branch authorized to execute a Medallion Signature Guarantee.    Although Kolinsky was not in the office that day, a Medallion Signature Guarantee was on the transfer form when Ciano received the Second Request back.

58.    Ciano then resent the Second Request to Royal Alliance's operations department which forwarded it to Pershing.  Pershing then transferred $1,477,000 from C.F.'s Royal Alliance account to SOS OPCO's bank account.

59.  C.F. was not aware that $1.8 million was transferred from his accounts to Snap-on Smile.

60.  In or about November 20, 2009, Hill contacted C.F. and solicited C.F. to invest an "additional" $150,000 in Snap-on Smile.  C.F., believing he had only invested $103,000, agreed to invest the purported additional $150,000.

61.    On November 20, 2009, $150,000 was transferred from C.F.'s account at Royal Alliance to SOS OPCO's bank account.

62.  On or about October 3, 2008, Gryphon-Hill[24] and SOS OPCO executed a "Secured Promissory Note" which provided that in exchange for $2,000,000 from Gryphon-Hill, SOS OPCO agreed to pay Gryphon-Hill "interest at a rate per annum equal to twenty percent (20%) on the aggregate unpaid principal balance . . ."

63.  Gryphon-Hill used the $1.8 million transferred to SOS OPCO from C.F.'s accounts plus $100,000 each from Hill

---

[24] Gryphon-Hill LLC, a Florida limited liability company, was formed in 2008.  Roy Glassberg and Lauri Hill (wife of Stephen Hill) were the managing members, but Lauri performed no duties there.  The New Jersey Bureau of Securities found "on information and belief" that Gryphon-Hill was formed as an investment vehicle for SOS OPCO.  Summary Order, ¶ 11.

and Glassberg[25] to finance the Secured Promissory Note with SOS OPCO.

64.   Also on October 3, 2008, SOS Holdings entered the "Amended and Restated Limited Liability Company Agreement" ("Holdings Operating Agreement") which stated, among other things, that the managing members of SOS Holdings included Glassberg, and that Glassberg would be one of the managers of SOS Holdings, SOS OPCO and SOS IPCO.

65.   During Hill's solicitation of C.F. on or about October 3, 2008 to invest in SOS OPCO, Hill failed to disclose to C.F. material facts including that:

      a.      Hill would be taking $1,800,000 from C.F. to invest in SOS OPCO;

      b.      Gryphon-Hill, not C.F., would be receiving the benefit of C.F.'s investment in Snap-on Smile,;

      c.      Gryphon-Hill was involved in the transaction, nor that it was controlled by Hill's wife and Glassberg; and

      d.      Hill's wife was a beneficial owner of the investment.

. . .

74.   Hill also engaged in the following dishonest and unethical practices in the securities business by failing to disclose to Royal Alliance, among other things, that he:

      a.      participated   in creating Gryphon-Hill as an investment vehicle to invest in Snap-on Smile;

      b.      sold an unapproved investment by soliciting and selling to C.F., a Royal Alliance client, an investment in Snap- on Smile;

      c.      caused a transfer of funds   from   C.F.'s Royal Alliance account that he had not approved;

      d.      caused false documents to be submitted to Royal Alliance and Pershing that he knew C.F. did not sign or approve; and

      e.      caused a transfer of funds for Gryphon-Hill's benefit, a company in which he and his

---

[25] Roy F. Glassberg was the registered agent for Gryphon-Hill, as well as an agent of Royal Alliance. Summary Order, ¶¶ 11 and 44.  He was a managing member of SOS Holdings and was to become a member of SOS OPCO and SOS IPCO.  Summary Order ¶ 64.  The New Jersey Bureau of Securities suspended Glassberg's agent and investment adviser representative registrations for two months per the Summary Order, p.27.

wife had a beneficial interest, without disclosing his or his wife's beneficial interest to C.F.

. . .

88.    Hill misappropriated C.F.'s funds by causing the transfer of approximately $1.7 million to Snap-On Smile without authorization from C.F., thus employing a device, scheme or artifice to defraud C.F. in violation of N.J.S.A. 49:3-52(a) and N.J.S.A. 49:3-53(a)(1), which is grounds, pursuant to N.J.S.A. 49:3-58(a)(2)(ii), to revoke the agent and investment adviser representative registrations of Hill.

89.    Hill used the approximately $103,000.00   approved investment and $1.7 million of misappropriated C.F.'s funds for the benefit of Gryphon-Hill instead of purchasing the Snap-on Smile investment for C.F.   By failing to use the funds as stated, and for C.F.'s benefit without C.F.'s knowledge or assent Hill employed a device, scheme or artifice to defraud client in violation of N.J.S.A. 49:3-52(a), which is grounds, pursuant to N.J.S.A. 49:3-8(a)(2)(ii), to deny the agent and investment adviser representative registrations of Hill.

. . .

98.    Hill made untrue statements of material facts or omitted to state material facts, including but not limited to, that:
      a.    he received a Bachelor's Degree in Economics and Finance from the University of Buffalo in New York in 1987 when in fact he had no degree at all;
      b.    he omitted to advise C.F. that C.F. had already invested $1.8 million in SOS when Hill sought and C. F. granted approval to invest the "additional" $150,000; and
      c.    he failed to disclose to C.F. and Royal Alliance that  he, and his wife, had and would receive additional beneficial interest in Gryphon Hill as a result of C.F.'s interest in S.O.S.

## V.    RESOLVING FLOYD'S RULE 10b-5 CLAIM FOR COUNT VI (PURCHASE OF HACKENSACK PARK PLAZA SECURITIES).

As indicated throughout, and as will be seen at Point VI, *infra*, at the threshold of the

plaintiff's motion is the question of the preclusive effect of findings of fact stated in the

Summary Order.  However, regarding Floyd's purchase of the Hackensack Park Plaza securities,

the plaintiff's assertions are glaringly weak even if preclusion were to be allowed. Hence,

assuming *arguendo* that the Summary Order states established facts, those facts (as augmented

by motion submissions) are inadequate as a matter of law to prove Hill's Rule 10b-5 violation.

The singular assertion of misrepresentation by Hill said to relate to Floyd's purchase of

Hackensack Park Plaza securities is (as stated and restated in the Summary Order):

> 23.     The Hackensack Park Plaza Private Placement
> Memorandum that was purportedly provided to one or
> more investors stated that Hill "received a Bachelor's
> Degree in Economics and Finance from the University of
> Buffalo in New York in 1987."
>
> 24.     Hill did not graduate from college.
>
> 98.     Hill made untrue statements of material facts or
> omitted to state material facts, including but not limited to,
> that:
> > a.     he received a Bachelor's Degree in
> > Economics and Finance from the University of Buffalo in
> > New York in 1987 when in fact he had no degree at all . . . .

Floyd's Affidavit in support of his motion is cryptic, emphasizes his loss but no other

facts, and is unavailing regarding any misrepresentation affecting his purchase of Hackensack

Park Plaza securities.[26]

---

[26]Floyd's Affidavit, in relevant part, says:

> 5.     In the sixth cause of action of the Adversary Complaint,
> I alleged that, on the acts related to the Hackensack Securities
> Offering, Debtor's debts to me in the sum of $1.25 million, or
> more, must be excepted from the Debtor's discharge pursuant to
> Bankruptcy Code section 523(a)(19).  [Footnote omitted.]
>
> 6.     My entire investment of $1.25 million in the Hackensack
> Offering was procured by Debtor's fraud, including securities
> fraud, and has been lost.  The loss of my entire investment is
> confirmed by the K-1 for 2012 issued to me by Hackensack Park
> Plaza, LLC, a copy of which is annexed hereto as Exhibit 1.
>
> 7.     Based on the foregoing, the Debtor owes me a debt of
> $1,250,000 in connection with the Hackensack Offering.
>
> . . .

Notably, neither Floyd in his Affidavit nor the Summary Order in text, states that Floyd received the private placement memorandum embodying Hill's untrue statement about his 1987 college degree.  Moreover, there is not a hint of the materiality of, reliance by Floyd upon, nor causative link to this misrepresentation in connection with Floyd's securities purchase.[27]

Floyd was acting on the advice of Hill, an investment advisor since 1993, in or about 2007 or 2008;[28] Hill's lie inventing a 1987 undergraduate degree, though indefensible, is irrelevant to Floyd's loss on Hackensack securities.

The prominent Third Circuit case of *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (2007) discusses at length and cites with approval Judge Meskill's *dissent* in *Marbury Mgmt. Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980).  Focusing on loss causation, *Marbury* involved the

---

10.    The issues, facts, circumstances, transactions and occurrences which form the basis for the entry of the Revocation Order are substantially the same as set forth in and which underlie: (i) the Hackensack Securities Fraud Action; and (ii) the SOS Securities Fraud Action.

11.    The Revocation Order determined that the Debtor violated N.J. securities laws in connection with both the Hackensack Offering and the SOS Offering.

[27] As to materiality, *see: EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 872 (3d Cir. 2000) ("[A] misrepresentation or omitted fact 'is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act'"), *citing TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976); *Basic Inc. v. Levinson,* 485 U.S. 224, 232 (1988) (adopting *TSC Industries* standard for materiality in § 10(b) and Rule 10b-5 context); *Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir. 2000); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425-26 (3d Cir. 1997).

As to reliance – transactional causation, *see: Berckeley Inv. Grp., Ltd. v. Colkitt,* 455 F.3d 195, 222 (3d Cir. 2006); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir. 2001); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95-96 (2d Cir. 2001); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir. 1981) *aff'd in part, rev'd in part,* 459 U.S. 375 (1983).

As to loss causation, *see*: *McCabe,* 494 F.3d at 426; *Berckeley,* 455 F.3d at 222; *Dura Pharm.,* 544 U.S. at 342; *Suez Equity,* 250 F.3d at 95-96; *Huddleston,* 640 F.2d at 549; *Marbury,* 629 F.2d at 708.

[28] At that time, Hill and Floyd had had a fifteen- or twenty-year relationship.  *See* Complaint ¶ 76. Whether Floyd knew that Hill did not have a college degree is unknown (and not referred to in the Summary Order or Floyd's Affidavit).

sale of securities to plaintiffs who dealt with a *trainee* who falsely represented himself as a licensed stockbroker and portfolio management specialist.[29]  *McCabe* quoted Judge Meskill's dissent that "[i]n straining to reach a sympathetic result, the majority [in *Marbury*] overlooks a fundamental principle of causation which has long prevailed under the common law of fraud and which has been applied to comparable claims brought under the federal securities acts." *McCabe*, 494 F.3d at 431 (*citing* Meskill J. dissent in *Marbury Mgmt.*, 629 F.2d at 716-17).  The dissent in *Marbury* acknowledged that in some situations courts have allowed parties to demonstrate causation with other elements such as a reliance or materiality.  However, this does not "undercut the requirement of a single, direct causal chain" requiring "a single, logical procession from violation to the injury."  *Marbury Mgmt.*, 629 F.2d at 720-21 dissent.  Judge Meskill, relying on an interpretation of loss causation later adopted by the Third Circuit, argued that the trainee's misrepresentation that he was a licensed broker did not proximately cause the decline in value of the plaintiffs' stocks.  The Third Circuit in *McCabe* reiterated that the injury must be directly caused by the wrongful conduct and not attributable to some intervening cause. 494 F.3d at 436.  *McCabe* (and the *Marbury Mgmt. dissent*) are dispositive precedent favoring Hill.

In the case at bar, there is no indication that Hill's misrepresentation had any connection whatsoever to the loss in value of securities acquired by Floyd (i.e., no facts support "loss causation"); nor indeed are there any facts linking that misrepresentation to Floyd's purchase of Hackensack Park Plaza securities (i.e., no facts support "transactional causation").

The plaintiff has thus failed to put forth a case for summary judgment on Count VI of the Complaint.  Genuine issues of material fact persist as to the plaintiff's allegations.

---

[29] These facts are far more egregious than Hill's misrepresentation.  Hill's lie perpetrated historic biographic information; the *Marbury* trainee acted out a hoax more contemporaneous with the sale of securities at issue.

## VI.    RESOLVING FLOYD'S RULE 10b-5 CLAIM FOR COUNT XII (PURCHASE OF SOS SECURITIES).

Unlike the prior Point, the Summary Order raises serious questions of Hill's Rule 10b-5 violations arising from Floyd's purchase of SOS securities.  *Inter alia*, did Hill, without Floyd's authorization, knowledge, or *ratification*, take Floyd's funds and, without Floyd's knowledge or consent, invest those funds in SOS securities?  Did Hill wrongfully employ "Gryphon-Hill" as a device to defraud Floyd?

Floyd's SOS case as a factual matter is built on the findings of the Summary Order.  Are those findings of fact preclusive in this adversary proceeding, or must Floyd independently establish them?[30]

### A.  Generally Applicable Law of Issue Preclusion – State Administrative Order Affecting Later Federal Litigation.

Neither of the full faith and credit foundation precepts has direct application here.  The Constitution's mandate requires states to honor judgments of sister states.  U.S. Const. art. IV, § 1.  The statutory full faith and credit provision of 28 U.S.C. § 1738 requires the enforcement of state court *judgments* by federal courts.   Nevertheless, § 1738 is pertinent for its use in intersystem cases of the derived common law doctrine of *res judicata*.  In broadest terms, federal courts are required to use the *res judicata* law of the state from which predecessor judgments are taken.  *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985); *Kremer v.*

---

[30] Floyd's Affidavit in support of his Motion, now as to SOS, is again unavailing.  It basically *reiterates* what the Summary Order found; there are only limited non-hearsay statements (establishing Floyd's damages and, at ¶ 17 and Exhibit 4, Hill's deposition responses admitting to certain aspects of the unauthorized transfers of Floyd's funds).   Most notably, at key points in the Affidavit Floyd is so completely reliant on the Order ("[t]he Revocation Order concluded . . .," ¶ 12, "[t]he Revocation Order determined . . .," ¶ 15) as to raise, in conjunction with Floyd's abandoning of his right to appear at trial and testify to Hill's acts, serious questions about the actual events at issue, including Floyd's knowledge or ratification of Hill's actions, etc.   *See* Hill's Exhibit G to Memorandum of Law in Opposition to Plaintiff's Motion.

*Chem. Constr. Corp.*, 456 U.S. 461, 481-82 (1982); *In re Crispino*, 160 B.R. 749, 752-53

(Bankr. D.N.J. 1993).

In the case at bar, this bankruptcy court thus must apply the New Jersey *res judicata* law.

Collateral estoppel ("issue preclusion"), emphasized below per New Jersey law, is a *common law*

extension of *res judicata* with a distinction:

> [W]here the second action is upon a different claim or
> demand, but between the same parties, the judgment in the
> prior action operates as an estoppel only as to those matters
> in issue or points controverted, upon the determination of
> which the finding or verdict was rendered.  In all cases,
> therefore, where it is sought to apply the estoppel of a
> judgment rendered upon one cause of action to matters
> arising in a suit upon a different cause of action, the inquiry
> must always be as to the point or question actually litigated
> and determined in the original action,–not what might have
> been thus litigated and determined, for it is only upon such
> matters as were actually litigated and determined that the
> judgment is conclusive.

*Mazzilli v. Accident & Cas. Ins. Co.*, 26 N.J. 307, 314 (1958), quoting *City of Paterson v.*

*Baker,* 51 N.J. Eq. 49, 53 (Ch. 1893) (internal citations in *Baker* omitted) (emphases added).

Collateral estoppel prevents a party from relitigating issues which were decided in a previous

court proceeding.  *In re Liquidation of Integrity Ins. Co./Celotex Asbestos Trust*, 214 N.J. 51, 66

(2013).  Establishing collateral estoppel requires that:

(1)     the issue to be precluded is identical to the issue decided in the prior
        proceeding;
(2)     the issue was actually litigated in the prior proceeding;
(3)     the court in the prior proceeding issued a final judgment on the merits;
(4)     the determination of the issue was essential to the prior judgment; and
(5)     the party against whom the doctrine is asserted was a party to or in privity
        with a party to the earlier proceeding.

*In re Dawson*, 136 N.J. 1, 20-21 (1994) (internal citations and parentheticals omitted).  *See also*

*State v. Gonzalez*, 75 N.J. 181, 189 (1977); *Slowinski v. Valley Nat'l Bank*, 264 N.J. Super. 172,

182-83 (App. Div. 1993).  The New Jersey criteria comport with the rule set forth in the

*Restatement of Judgments*:

> When an issue of fact or law is actually litigated and
> determined by a valid and final judgment, and the
> determination is essential to the judgment, the
> determination is conclusive in a subsequent action between
> the parties, whether on the same or a different claim.

*Restatement (Second) of Judgments* § 27 (1982) (Issue Preclusion–General Rule) ("*Restatement
§ 27*").

New Jersey courts do not give preclusive effect to matters embodied in default judgments
because such matters are not *actually litigated. Slowinski*, 264 N.J. Super. at 183-84; *In re
Hawkins*, 231 B.R. 222, 229-32 (D.N.J. 1999); *In re Azeglio*, 422 B.R. 490, 493, 495 (Bankr.
D.N.J. 2010); *Gallo v. Tooley*, 2007 WL 1071945, *2 (Bankr. D.N.J. April 3, 2007) (DHS).  *See
Restatement* § 27, Comment e.[31]

The narrow focus of the matter at bar (state administrative tribunal determination
followed by federal litigation)[32] was addressed comprehensively in *University of Tennessee v.
Elliott*, 478 U.S. 788, 794-95 (1986).  There the Supreme Court reviewed the effect of a state
court administrative proceeding (the decision of a state administrative law judge, unreviewed by
a state law judge, in a wrongful termination proceeding) on the employee's subsequent civil
rights case in district court.   The federal case was based on Title VII of the 1964 Civil Rights
Act *and* the Reconstruction civil rights statutes (42 U.S.C. § 1983 and other causes).  As a
general matter, the Supreme Court recognized a federal common law of issue preclusion:

> Title 28 U.S.C. § 1738 governs the preclusive effect
> to be given the judgments and records of state courts, and is
> not applicable to the unreviewed state administrative
> factfinding at issue in this case.   *However, we have
> frequently fashioned federal common-law rules of
> preclusion in the absence of a governing statute. . . .*

---

[31] The Third Circuit recognized an exception to this rule when the defaulting party had pleadings stricken
in the first proceeding and was barred from further participation in it because of misconduct and
obstructionist tactics.  *See In re Docteroff*, 133 F.3d 210, 215 (3d Cir. 1997) (applying *federal* rules of
collateral estoppel because the first judgment issued in federal court).

[32] *See, generally*, 18 *Moore's Federal Practice* Ch. 133 (3d ed. 2012) [hereinafter "*Moore's*"].

> Although § 1738 is a governing statute with regard to the
> judgments and records of state courts, because § 1738
> antedates the development of administrative agencies it
> clearly does not represent a congressional determination
> that the decisions of state administrative agencies should
> not be given preclusive effect.

*Elliott*, 478 U.S. at 794-95 (emphasis added).  Relying on principles recited in *United States v. Utah Construction & Mining Co.*, 384 U.S. 394 (1966) and *Kremer v. Chemical Construction Corporation,* 456 U.S. 461 (1982), the Court held as follows:

> [W]e hold that when a state agency "acting in a judicial
> capacity . . . resolves disputed issues of fact properly before
> it which the parties have had an adequate opportunity to
> litigate," *Utah Construction & Mining Co.,* [384 U.S. at
> 422], federal courts must give the agency's factfinding the
> same preclusive effect to which it would be entitled in the
> State's courts.

*Elliott*, 478 U.S. at 799.  The Supreme Court's conclusion (applying issue preclusion under federal common law but relying upon the preclusion law of the state) affected *only* the Reconstruction civil rights statutory claims.  The text and history of 1964 Civil Rights Act, Title VII, was found to reflect "that Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims."  478 U.S. at 797 (footnote omitted).[33] *See Edmundson v. Bor. of Kennett Square*, 4 F.3d 186, 192-93 (3d Cir. 1993) (upholding the preclusive effect, in a subsequent federal action, of unreviewed findings of fact by the civil service commission of a Pennsylvania borough but *not* of its unreviewed conclusions of law).

Determining, for issue preclusion purposes, whether an administrative body acts in a judicial capacity is a fact-sensitive inquiry.  Consideration is given to whether, in conjunction with its determinations, that body holds hearings where, for example, parties-in-interest are

---

[33] In effect Title VII was deemed to *preempt* the federal common law of preclusion.  Similarly, s*ee Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994), discussed in Part III (d), *supra*.  The preemption in *Meyer* went to the impact of a federal *default* judgment on § 523(a)(11), which, notwithstanding the federal common law of preclusion generally denying preclusive effect to default judgments, was deemed to satisfy this exception to bankruptcy discharge's requirements.  *Compare and contrast Moore's* § 132.03[2][k][iii][A] with [B]; *consider In re Calvert*, 105 F.3d 315 (6th Cir. 1997).

allowed to be present and to be represented by counsel; to subpoena, call, examine and

cross-examine witnesses; to give testimony under oath, to introduce evidence under oath, and to

offer oral or written argument; and, further, where there is a requirement for the maintaining of a

verbatim transcript. *Plaine v. McCabe,* 797 F.2d 713, 719-20 (9th Cir. 1986); *People v. Sims*,

651 P.2d 321, 328 (Cal. 1982) (superseded by statute on an unrelated issue).

New Jersey courts recognize the competence of New Jersey administrative bodies in

litigated matters. *Hennessey v. Winslow Twp.*, 183 N.J. 593, 600 (2005) ("as administrative law

procedures have matured in this State, courts have recognized that administrative bodies can and

do provide a full and fair opportunity for litigation of an issue for various purposes").   In proper

circumstances preclusive effect is given to the fact-finding of New Jersey administrative bodies.

*Winters v. N. Hudson Reg'l Fire Rescue*, 212 N.J. 67, 87 (2012) ("We have recognized that

concerns about finality and consistency as between tribunal findings, rooted in principles of

equity and economy, are applicable to the intersection of judicial and administrative

proceedings"); *Hackensack v. Winner*, 82 N.J. 1, 29, 32 (1980) (recognizing that at times

administrative bodies have a "quasi-judicial" function and therefore it is proper "to apply to

administrative agencies, in appropriate situations, judicial rules conducive to the ends of

intergovernmental compatibility and harmony, such as Res judicata, collateral estoppel, the

single-controversy doctrine and the like"); *see also Ensslin v. Twp. of N. Bergen*, 275 N.J. Super.

352, 369 (App. Div. 1994).

New Jersey courts have on occasion granted preclusive effect to the fact-finding of

administrative agencies with explicit reference to *Restatement* § 27 (Issue Preclusion–General

Rule) and to *Restatement* § 28 (Exceptions to the General Rule of Preclusion).[34] *Compare and*

---

[34] *Restatement* § 28 (Exceptions to the General Rule of Preclusion) [¶¶ 1, 4 and 5 omitted]

Although an issue is actually litigated and determined by a valid and final judgment, and the
determination is essential to the judgment, relitigation of the issue in a subsequent action between the

contrast *Zoneraich v. Overlook Hosp.*, 212 N.J. Super. 83, 94-95 (App. Div. 1986) (granting, on

a defensive basis, preclusive effect to administrative determination in later litigation), with

*Olivieri v. Y.M.F. Carpet, Inc.,* 186 N.J. 511, 523, 527 (2006) (denying preclusive effect of

administrative determination in later litigation, where first hearing was too informal and, overall,

record was inadequate).   *See Restatement* § 83 (Adjudicative Determination by Administrative

Tribunal).

### B.  Offensive Collateral Estoppel.

In addition to the intersystem and predicate administrative aspects of the preclusion issue

*sub judice*, the plaintiff is arguing for the application of *offensive collateral estoppel*.

In *Parklane Hosiery Company, Inc. v. Shore* the Supreme Court held that issues of fact

adversely adjudicated against an original party in a first proceeding may be given preclusive

effect in a second proceeding even though the subsequent litigation is brought by a new party.

439 U.S. 322, 331 (1979).  (This application has been dubbed "offensive collateral estoppel";

*compare and contrast, e.g., Elliott,* where the second litigation involved the same parties).  In

*Parklane*, plaintiff brought a class action suit in District Court against a corporation, its officers,

directors and certain stockholders, for allegedly issuing a materially false and misleading proxy

statement in violation of the Securities and Exchange Act of 1934.  Prior to the final adjudication

---

parties is *not precluded* in the following circumstances:

. . .

(2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a
new determination is warranted in order to take account of an intervening change in the applicable legal
context or otherwise to avoid inequitable administration of the laws; or

(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the
procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them;
or

. . .

[Emphasis added.]

of this action, the SEC filed suit in District Court against these same defendants, also alleging

that the proxy statement was materially false and misleading.  The District Court, after trial,

entered a declaratory judgment for the SEC.  The class action plaintiffs moved for summary

judgment in their proceeding, arguing that the defendants should be collaterally estopped from

relitigating the issue of the materially false and misleading proxy statement.  *Id*. at 324-25.

The Supreme Court acknowledged that the offensive use of collateral estoppel has its

pitfalls.  *Id*. at 329-30.   However, this does not vitiate its application in certain situations.

Rather, trial courts should be granted "broad discretion to determine when it should be applied."

*Id.* at 331.  Courts should *not* apply offensive collateral estoppel in cases where a plaintiff should

have joined in the prior proceeding or where its application would be unfair to the defendant (as

when the incentive to litigate is not great in the first action, where there are inconsistent prior

judgments, or where procedural opportunities afforded are enhanced in the subsequent

proceeding).  *Id*. 330-31.  *Parklane* remains an oft-cited precedent in both federal and state cases.

In *McIntyre v. ILB Investment Corporation*, the trial court invoked offensive collateral

estoppel where the New Jersey Bureau of Securities had, in a previous administrative

proceeding, found that defendants had sold unregistered securities.  172 N.J. Super. 415 (Ch.

Div. 1979).  In subsequent litigation brought by a purchaser of the unregistered securities, the

court analyzed the facts of the case in conjunction with the *Parklane* factors, finding: (1) the

plaintiff and her assignor could not have joined in the prior New Jersey Bureau of Securities

hearings; (2) the defendants had "every incentive to fully and vigorously litigate" in the prior

proceeding, which resulted in civil penalties; and (3) the New Jersey Bureau of Securities

findings were not inconsistent with any prior judgments.  *Id.* at 423.  The court acknowledged

diminished procedural opportunities in the administrative process.  However, it relied on New

Jersey case law to conclude first, that due process had been satisfied, and second, that the

Bureau's thorough investigation with ample supporting evidence justified application of

collateral estoppel *as to the sale of unregistered securities. Id.* at 424.  Nevertheless, and most

notably as related to the matter at bar, *offensive collateral estoppel was not permitted with regard*

*to the greatly more nuanced claims by plaintiff of material misrepresentations and omissions.*

The court opined:

> While it is true that the allegations in the complaint are
> essentially the same as the Bureau's conclusions, no
> documents, letters or depositions have been presented by
> plaintiff which substantiate these claims. Unlike Parklane,
> this case involves "offering material" rather than a single
> proxy statement. While the substance of this material is
> alluded to in the Bureau of Securities' findings, the specific
> documents referred to therein have not been submitted to
> this court. The findings indicate that the offering material
> consisted of applications and letters but noted that in some
> cases the content of these letters differed. . . . In light of the
> above, it would be unfair to collaterally estop the
> defendants from litigating the issue in the case at bar. This
> part of plaintiff's motion for summary judgment is therefore
> denied. [*Id.* at 425-26.]

*See also Kortenhaus v. Eli Lilly & Co.*, 228 N.J. Super. 162 (App. Div. 1988) (defendant was not

precluded from contesting liability conclusions reached in a companion case because there was

inconsistency among prior judgments as to liability and the issues actually litigated in the

companion case were unclear and may not have been identical).  *See generally Restatement* § 29

(Issue Preclusion in Subsequent Litigation with Others).

## C.  Section 523(a)(19) – Its Specific Effect on Preclusion *Sub Judice*.

Section 523(a)(19) extends issue preclusion in bankruptcy beyond its common law limits

*in certain circumstances*.  That extension is neither limitless nor a wholesale revision for

bankruptcy purposes of the established law of preclusion.  It remains for case-by-case

development to define the full effect of Sarbanes-Oxley on the securities law-based exception to

bankruptcy discharge.  However, certain predictable applications of the law are worth

examining.  And, most importantly to the case at bar, it is necessary to identify where

Sarbanes-Oxley leaves preclusion law unaffected.

Perhaps the clearest application of extended issue preclusion per Sarbanes-Oxley is to actions by securities regulators (particularly at the state level).  The Summary Order illustrates such action: license ("registration") revocation and a $210,000 fine.[35]  The Order was nonfinal when issued, subject to challenge in a hearing, and appealable if it were to survive the hearing process.  Viewed per certain issue preclusion orthodoxy, a bankruptcy court might summarily refuse to accept the Order as establishing Hill's *debt for the fine*.  That Order, unchallenged (effectively a "default" in the available hearing process) could well be viewed as involving determinations not "actually litigated."  However, Sarbanes-Oxley would serve the New Jersey Bureau Chief's interest in not having to reprove his case in bankruptcy with respect to an Order which would appear to be *enforceable* in New Jersey.  Congress's preemption of the common law of collateral estoppel would apply.  Sarbanes-Oxley would support the state administrator's preclusive use of the Order to prove violation of the securities law, entitlement to the fine, and exception to discharge.

Two related points about the preemptive effect of Sarbanes-Oxley on the preclusive use in bankruptcy of the Summary Order in the above illustration must be stressed.  First, the bedrock characteristic of the Order is that it must be *enforceable* in the state of its issuance *as to the fine*.  Sarbanes-Oxley does not convert essentially unenforceable orders into federally sanctioned adjudications.  It *does,* in certain circumscribed circumstances, promote in bankruptcy application of enforceable orders *preclusively*, even where common law issue preclusion might otherwise undercut that application.

The second point of emphasis about the preemptive expansion of preclusion in bankruptcy is that Congress's intended area of impact on the common law is pinpointed by the text of § 523(a)(19).  It is *only* those judgments, orders or decrees which are the sources of the

---

[35] The exception to discharge for this fine is *not presently before this court*.  Discussion of this part of the Summary Order is by way of illustration and not a determination of exception to discharge nor is it an adjudication of the allowance of that fine as a debt of Hill.

debts to be excepted from discharge which qualify for possible extended preclusive use.

Therefore, in the illustration using the Summary Order preclusively to except the regulator's fine

from discharge, the Order is the source of the "debt" (the monetary penalty or fine) based upon

violation of securities law; that is, the debt "*results . . . from*" the Order.

The immediate effort of the plaintiff to use, preclusively, findings of fact announced in

the Summary Order is at great variance with the above fine enforcement illustration.  While the

Summary Order in its direct effect on the debt which *results from* it (i.e., the $210,000 fine) may

benefit from extended preclusive effect per § 523(a)(19)(B), no such extension is afforded an

order which does not embody the debt at issue for discharge (that said to be due Floyd by Hill).

It is an Order which, in and of itself, does *not* give rise to the debt that *Floyd* would have this

court except from Hill's discharge.  That debt remains to be adjudicated.  To the extent that

adjudication is dependent on issue preclusion, the applicable common law is unaffected by

Sarbanes-Oxley.[36]

### D.  Floyd's Case for Issue Preclusion Under Applicable Law.

Floyd's reliance on the Summary Order depends solely on that Order's preclusive effect

under New Jersey common law, in establishing Hill's federal securities law violations.  For the

reasons set forth below, the Summary Order will not be applied preclusively for Floyd's benefit.

(i)    General New Jersey requirements for the application of collateral estoppel

(consistent with *Restatement* § 27)  are not satisfied, including:

a.    The facts sought to be established preclusively were not "*actually litigated*" in

the investigative process undertaken by the Chief of the New Jersey Bureau of

---

[36] The effect of § 523(a)(19) in cases where issue preclusion is not extended is that the section provides in
many instances an easier path to excepting a securities law based debt from discharge than the often more
difficult to prove exceptions of § 523(a)(2)(4) and (6).

Securities (Hill's failure to contest being the equivalent of a default,[37] and the investigative process itself not satisfying *judicial* or *quasi-judicial* requirements[38] relative to Floyd's rule 10b-5 claims or equivalent); and

   b.   As a corollary to the failure to actually litigate the issues, *no final judgment on the merits* as to Floyd's claims was rendered;[39]

(ii)   New Jersey precedent renders the Summary Order the product of an "investigative" administrative process as it would relate to Floyd's claims; Hill was, prior to the Order's issuance, afforded no opportunity to contest facts or contentions of law before the Bureau Chief; there was no "hearing," and thus no opportunity for representation, confronting of witnesses, review of exhibits, etc.;[40] indeed, there is no evidence here that a reviewable record exists;[41]

(iii)   NJUSL limits use of its regulatory enforcement provisions in establishing civil liability to individual investors, thus creating a clear distinction between the Bureau Chief's findings and conclusions arising from his investigative/regulatory functions and those investors' NJUSL civil actions based upon nuanced and subjective misrepresentation and omission claims;[42] that distinction impedes Floyd's effort to cast the Summary Order for his individual purposes as being the

---

[37] *See, e.g., Slowinski v. Valley Nat'l Bank*, 264 N.J. Super. at 182-83; *Restatement* § 27, Comment e.

[38] *See, e.g., Oliveri v. Y.M.F. Carpet, Inc.*, 186 N.J. at 523, 527; *Hackensack v. Winner*, 82 N.J. 1 at 32-33*; Ensslin v. Twp. of N. Bergen*, 275 N.J. Super. at 369; *see generally Restatement* § 83.

[39] *See e.g., Hennessey v. Winslow Twp.*, 183 N.J. at 604; *Hernandez v. Region Nine Hous. Corp.*, 146 N.J. 645, 655, 660 (1996); *Slowinski v. Valley Nat'l Bank*, 264 N.J. Super. at 182-83; *In re Azeglio*, 422 B.R. at 497; *Gallo v. Tooley*, 2007 WL 1071945, *2.

[40] *See, e.g., Hackensack v. Winner*, 82 N.J. 1 at 32-33*; Ensslin v. Twp. of N. Bergen*, 275 N.J. Super. at 369; *consider Plain v. McCabe*, 797 F.2d at 719-20.

[41] *See, e.g., McIntyre v. ILB Inv. Corp.*, 172 N.J. Super at 425.

[42] *See* N.J.S.A. § 49:3-71(j).

result of even a quasi-judicial process; and

(iv)    The would-be offensive collateral estoppel asserted by the plaintiff here fails the

*Parklane* test in that Hill did not have an opportunity to litigate aspects of his *civil*

*liability* fully and fairly *before* the Bureau Chief issued the Summary Order; Hill

lacked incentive (and perhaps the means) to press for a hearing before the Bureau

as that process might have related to his civil liability; and, *inter alia* this court in

its discretion considers use of offensive collateral estoppel basically unfair under

these circumstances.[43]

## VII.   <u>CONCLUSION</u>.

Plaintiff's near-exclusive reliance on the issue preclusive effect of the Summary Order

has proven to be unfounded.  Neither an extension of the common law via Sarbanes-Oxley

(§ 523(a)(19)) nor traditional common law issue preclusion is applicable *sub judice*.  Therefore,

the plaintiff has failed to establish facts necessary to support his Summary Judgment Motion as it

would apply to Count XII ("SOS").  Count VI ("Hackensack Park Plaza") is also unsupported by

the Summary Order.  The plaintiff's Summary Judgment Motion is denied as to both counts.

Since the plaintiff has waived trial and thus will not go forward with his case beyond the

now-denied motion, Floyd's complaint must be dismissed.  The court will issue its implementing

order.

Dated:  August 12, 2013             /s/Morris Stern                       
                                       MORRIS STERN
                                       United States Bankruptcy Judge

---

[43] *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. at 330-31; s*ee also McIntyre v. ILB Inv. Corp.*, 172 N.J. Super. at 424-26; *Restatement* § 29.